**In re EPIC CAPITAL CORPORATION, et al., Debtors.**

**The Bank of New York, as Indenture Trustee, Plaintiff,**

**v.**

**Epic Resorts—Palm Springs Marquis Villas, LLC,**

**and**

**USA Capital Diversified Trust Deed Fund, LLC, Defendants.**

**Bankruptcy No. 01–2458 (MFW).**
**Adversary No. 02–3021(MFW).**

United States Bankruptcy Court, D. Delaware.

Feb. 27, 2003.

Kevin Gross, Herbert W. Mondros, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE, Robin E. Keller, Stroock & Stroock & Lavan, LLP, New York City, Counsel for Anthony H.N. Schnelling, Chapter 11 Trustee.

David M. Fournier, Aaron A. Garber, Pepper Hamilton, LLP, Wilmington, DE, Leonard M. Parkins, Tom A. Howley, Haynes & Boone, LLP, Houston, TX, Counsel for Bank of New York, As Successor Indenture Trustee.

W. Harding Drane, Laurie Selber Silverstein, William A. Hazeltine, Potter, Anderson & Corroon, LLP, Wilmington, DE, Counsel for the Official Committee of Unsecured Creditors.

Teresa K.D. Currier, Kathleen P. Makowski, Klett, Rooney, Lieber & Schorling, Wilmington, DE, Jeffrey A. Deller, James Helton Joseph, Klett, Rooney, Lieber & Schorling, Pittsburgh, PA, Counsel for USA Capital Diversified Trust Deed Fund, LLC.

Julie L. Compton, Wilmington, DE, Office of the United States Trustee.

## *OPINION* [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Amended Motion of USA Capital for Order (i) Granting Relief from the Automatic Stay, (ii) Directing the Trustee to Provide USA Capital with Adequate Protection, and (iii) Directing the Debtor to Abandon USA Capital's Collateral ("the Stay Motion"). Bank of New York ("BONY"), the Official Committee of Unsecured Creditors ("the Creditors' Committee") and Anthony H.N. Schnelling, the chapter 11 trustee ("the Trustee"), filed objections to the Motion.

BONY objected on the grounds that it possessed an equitable lien or mortgage on USA Capital's collateral and that USA Capital's lien position should be subordinated to BONY's lien position pursuant to 11 U.S.C. § 510(c). Evidentiary hearings on the Stay Motion were held on April 30 and May 21, 2002. Post-trial briefs have been submitted.

BONY also filed an adversary proceeding against USA Capital and Epic Resorts Palm Springs Marquis Villas, LLC ("Epic Palm Springs") to Determine Validity, Extent and Priority of Liens, and for Equitable Subordination Pursuant to 11 U.S.C. § 510(c). On July 10, 2002, USA Capital filed a Motion for Summary Judgment in the adversary proceeding and on August 6, 2002, BONY filed its Cross–Motion for Summary Judgment.

Since both the Stay Motion and the Summary Judgment Motions deal with the same issues, we decide them together. For the reasons set forth below, we grant the Stay Motion and USA Capital's Summary Judgment Motion and deny BONY's Cross–Motion for Summary Judgment.

## I. *FACTUAL BACKGROUND*

Epic Resorts, LLC ("Resorts") is a holding company that, through its subsidiaries (collectively, "Epic"), owns and operates several vacation resorts in the United States, including resorts in Las Vegas, Nevada, Scottsdale, Arizona, Palm Springs, California, Daytona Beach, Florida, Lake Havasu City, Arizona, and Hilton Head, South Carolina.[2] One of these subsidiaries is Epic Palm Springs which owns and operates a 101 unit timeshare resort in Palm Springs, California ("the Property"). The land on which Epic Palm Springs operates its resort is land administered by the Unit-

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2. Thomas F. Flatley ("Mr. Flatley") is the owner of Resorts and owns approximately 99% of the resorts.

ed States Department of Interior, Bureau of Indian Affairs ("BIA"). Epic Palm Springs leases the Palm Springs resort under a ground lease approved by the BIA ("the Lease").

Pursuant to a trust indenture dated July 8, 1998, Resorts and Epic Capital Corporation ("Capital") issued $130 million in Senior Secured Redeemable Bonds due by 2005. BONY is the current indenture trustee. The majority of the Bonds are held by the Highland Funds. The Indenture provided that Resorts and Capital would grant BONY a deed of trust in, *inter alia*, the Palm Springs resort. However, this covenant could only be fulfilled after the BIA consented, which Resorts and Capital agreed to obtain within sixty days after closing. BIA's approval was never obtained.

Almost two years after closing on the Indenture, Epic Palm Springs approached USA Capital to borrow additional funds for working capital purposes. On or about June 26, 2000, USA Capital and Epic Palm Springs executed various documents ("the Loan Agreements") whereby USA Capital agreed to lend Epic Palm Springs $11.5 million. As security for the loan, Epic Palm Springs granted USA Capital a security interest in substantially all of its assets, including the Master Lease, the 66 condominium units in the Palm Springs resort that had not yet been sold as timeshares by Epic Palm Springs, and all common areas, equipment, personalty, fixtures, and rents related thereto, and all products and proceeds of the same (the "Collateral").

When Epic Palm Springs granted USA Capital a lien, Epic Palm Springs represented that no other creditor held a lien on the Collateral. USA Capital obtained a title examination on the Property and confirmed with the BIA that no other lien existed on it. Although obtained after the closing, USA Capital also obtained an opinion letter from Epic's counsel that the USA Capital transaction would not violate the terms of the Indenture and that no other lien encumbered the Palm Springs resort. The BIA approved the security interest granted to USA Capital on June 22, 2000, and USA Capital perfected its security interests in the Lease by recording its Leasehold Deed of Trust with the Official Records of Riverside County on July 5, 2000.

Thereafter, Epic Palm Springs committed numerous defaults under the USA Capital loan. In April of 2001, Epic Palm Springs was advised that it was in default of the Loan Agreements for failure to comply with the financial reporting and other covenants of the Loan Agreement. In June of 2001, Epic Palm Springs also failed to make requisite interest payments on the Bonds to the bondholders. Beginning in August 2001,[3] Epic Palm Springs failed to make the requisite payments due to USA Capital under the Loan Agreements. Epic Palm Springs also failed to timely and promptly pay all obligations that accrued under the Lease.

Resorts and Capital also defaulted on their obligations to make an $8.45 million interest payment to their bondholders. At about the same time, Prudential Securities Corporation terminated the monetization facility that it had provided to Epic, thereby severely restricting its cash flow. As a result, the Highland Funds filed involuntary bankruptcy petitions against Resorts and Capital on July 19, 2001, and commenced involuntary bankruptcy proceed-

---

**3.** As part of the $11.5 million loan made by USA Capital, $1.5 million was used to fund a reserve to make interest payments to USA Capital. That reserve was exhausted in August, 2001.

ings against Epic Palm Springs on November 9, 2001.

On October 15, 2001, Resorts and Capital consented to the entry of an Order for Relief under Chapter 11 of the Bankruptcy Code. On February 14, 2002, we granted the Motion of the Highland Funds for appointment of a Chapter 11 trustee.

As of April 30, 2002, the outstanding obligations owing from Epic Palm Springs to USA Capital totaled $13,804,833.66. The amount continues to accrue as Epic Palm Springs and the Trustee have not made any post-petition adequate protection payments to USA Capital. In addition, approximately $310,000 in real estate taxes remain unpaid with respect to the Palm Springs resort thereby giving rise to at least $14.1 million of secured debt on the Collateral. The parties have stipulated that the Collateral is presently valued on $14,019,525.00.

Since the hearing on USA Capital's Motion, the Trustee has entered into a Settlement Agreement with Epic Vacation Club, Five Star Leisure Management LLC, Thomas Flatley, various Homeowner Associations and others that resolves all of the outstanding litigation between the trustee, various directors and insiders of the HOA's, the Creditors' Committee and various bondholders. The Settlement Agreement gives the Trustee control of the Vacation Club, the management company (Five Star) and the Homeowner Associations. This will allow the Trustee to operate the various resorts more effectively and position them for a sale as going concerns. The settlement was approved on December 12, 2002.

In addition, the Trustee has now obtained post petition financing for the various Debtors: a $5,969,000.00 post-petition loan that will be used to pay wages, salaries, operating expenses, accrued professional fees, and other expenses necessary to preserve their assets. Part of the loan proceeds ($500,000) was budgeted for expenses involving the Palm Springs lease, including rent, real estate taxes, utilities, payroll and insurance. However, no debt service will be paid to USA Capital. The post-petition financing was approved by Order dated December 12, 2002.

## II. JURISDICTION

The Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b), and the standing order of reference of the district court. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A),(G),(K) and (O).

## III. DISCUSSION

### A. Standard for Relief from Stay

Relief from the automatic stay is appropriate under section 362(d), under the following circumstances:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection(a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization....

11 U.S.C. § 362(d).

 A creditor seeking relief from the stay has the burden of proving the debtor's lack of equity. 11 U.S.C § 362(g)(1). *See also In re Hanley*, 102 B.R. 36, 37 (W.D.Pa.1989). The party op-

posing the relief bears the burden of proving all other issues, including whether the collateral is necessary for an effective reorganization. 11 U.S.C. § 362(g). *See also Nazareth National Bank v. Trina-Dee, Inc.*, 731 F.2d 170, 171 (3d Cir.1984). However, even if there is no equity, a debtor need only establish through *prima facie* evidence that the collateral will likely play a significant role in the reorganization. *See In re Island Helicopter Corp. et al.*, 63 B.R. 809, 815 (Bankr.E.D.N.Y.1986).

### B. *Equity in the Collateral*

USA Capital argues that it has satisfied the requirements for relief from the stay under section 362(d)(2) because there is admittedly no equity in the Property. The Collateral is encumbered by at least $14.1 million of secured debt. This debt consists of USA Capital's secured claim of $13,804,833.66 as of April 30, 2002, and unpaid real estate taxes that approximate $310,000. The parties have stipulated that the Collateral is presently valued at $14,019,525.00. Thus, the estate lacks equity in the Property.

BONY opposed the Stay Motion by asserting that USA Capital's lien is subordinate to an equitable lien that BONY holds. Since BONY's asserted equitable lien was never perfected, it is avoidable by the Trustee who could nonetheless retain that equitable lien position vis-á-vis USA Capital thereby resulting in equity in the collateral for the estate. *See* 11 U.S.C. §§ 544 & 551. The basis for BONY's asserted equitable lien is articulated in the complaint brought by it against USA Capital. That issue is ripe for decision as a result of the cross-Motions for Summary Judgment.

### 1. *Standard for Summary Judgment*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" if the "pleadings, depositions, answers to interrogatories, and admissions on file" demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed. R.Civ.P. 56(c). Federal Rule of Bankruptcy Procedure 7056 provides that the Rule 56 applies to adversary proceedings.

According to the United States Supreme Court, "[s]ummary judgment ... is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) *quoting* Fed.R.Civ.P. 1.

### 2. *Equitable Lien*

BONY argues that an equitable lien arose in the Palm Springs lease in its favor when the parties executed the Indenture Agreement even though they never obtained approval from the BIA. BONY further asserts that its equitable lien has priority over USA Capital's properly perfected security interest in the same property because BONY's interest in the property arose before USA Capital's.

It is conceded by BONY that it failed to perfect a security interest in the Palm Springs lease when it closed the bond issue. However, BONY argues that, although it did not have a formal lien on the leasehold property, it obtained an equitable lien on the property because the parties *intended* for a security interest to be conveyed to it. BONY asserts the parties' intention is evidenced by several documents, including the Indenture, the Closing Index, the Purchase Agreement, and

the Offering Memorandum.[4]

■ "In bankruptcy, the existence and power of liens is controlled by state law, unless its application would frustrate a federal policy." *Lewis v. Diethorn*, 893 F.2d 648 (3d Cir.1990), *cert. denied*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). The parties disagree as to whether federal or state law applies. BONY argues that the dispute is governed by state law because the action relates to personal property of Epic Palm Springs and involves non-Indian, non-federal parties (BONY, USA Capital and Epic Palm Springs). USA Capital, on the other hand, argues that federal law, specifically the Supremacy and Indian Commerce Clauses of the United States Constitution, applies.

■ The Court agrees with USA Capital that federal law preempts state law regarding encumbrances of Indian lands. *See* 25 C.F.R. § 1.4 (no state law governing, regulating or controlling the use or development of land shall apply to Indian lands). *See also* 28 U.S.C. § 1360. Federal law preemption arises under the Supremacy Clause of the United States Constitution, U.S. Const., Art. VI, Cl.2 ("this Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land . . ."), and the Indian Commerce Clause, *id.*, Art. I, Sec. 8, Cl. 3 ("the Congress shall have Power . . . To regulate Commerce . . . with Indian Tribes").

It is undisputed that the Palm Springs resort is located on Indian land and is administered by the BIA. The United States holds legal title to Indian lands in trust for the benefit of Native Americans. 25 U.S.C. § 348. Congress has authorized the leasing of property on Indian land, but approval of the Secretary of the Interior is required as a prerequisite to the execution of a valid and binding lease. 25 U.S.C. § 415(a). Further, if a lessee wishes to encumber his leasehold interest, the Secretary must also approve the encumbrance instrument. *Id.* Therefore, pursuant to applicable federal law, BONY cannot hold a valid lien on the leasehold absent the prior approval of the Secretary of the Interior of the United States Department of Interior, Bureau of Indian Affairs. The imposition of an equitable lien would conflict with Federal law requiring the BIA's approval of any lien.

■ BONY nonetheless argues that it has an equitable lien on the lease. However, the application of the equitable lien doctrine is limited. "While the equitable lien doctrine has been held in this District to have survived the enactment of the Uniform Commercial Code, it has only applied in situations where a secured creditor is prevented from perfecting its interest by an uncooperative debtor." *In re Trim–Lean Meat Products, Inc.*, 10 B.R. 333 (D.Del.1981).

BONY argues that an equitable lien exists because the parties' Indenture agreement, the Closing Index, the Purchase Agreement, and the Offering Memorandum clearly reflect the parties' intention to convey a lien on the leasehold. However,

---

**4.** Mr. Flatley, Epic Palm Springs president, testified at trial that prior to the bond closing, Epic reached an oral agreement with BONY whereby Epic would grant a lien in a resort located in Daytona, Florida, rather than grant a lien in the Palm Springs lease. BONY moved to strike Mr. Flatley's testimony on the grounds that it violated the parol evidence rule. The Court agrees with BONY that the testimony is barred by the parol evidence rule because the oral agreement was allegedly made prior to the execution of the written contracts (the Indenture Agreement and other closing documents) and contradicts the language contained therein. We also have not found Mr. Flatley's testimony in this case to be credible.

the language of those documents do not support such a conclusion. Section 11.01(e) of the Indenture states:

> Each Issuer covenants and agrees that it will use its reasonable best efforts to obtain consent from the Department of Interior—Bureau of Indian Affairs (the "Bureau") to the imposition of a leasehold mortgage on the leasehold interest of Epic Resorts—Palm Springs Marquis Villas, LLC in the real property leased by it. Promptly upon receipt of such consent, the Issuers shall grant, or cause to be granted, such leasehold mortgage ... to the Trustee to secure the Obligations of Epic Resorts—Palm Springs Marquis Villas, LLC under its subsidiary guaranty....

The Prospectus, prepared in connection with the Indenture Agreement, states, in relevant part:

> In addition, with request to the proposed leasehold mortgage on the Palm Springs, Marquis Villas leasehold, no assurance can be given that the company will be able to obtain the approval of the Bureau of Indian Affairs to impose such a mortgage. If such approval is not obtained, the subsidiary guarantee of Epic Resorts–Palm Springs Marquis Villas, LLC will not be secured by any mortgage on such leasehold.

BONY relies on *Wal–Mart Stores, Inc. v. Carpenter (In re Carpenter)*, 252 B.R. 905 (E.D.Va.2000) to support its assertion. In Carpenter, the Court found that Wal–Mart had presented sufficient evidence to support the inference that the parties intended to convey a lien. *Id.* 252 B.R. at 911. We conclude that *Carpenter* is inapplicable. The Indenture and the Prospectus do not clearly express the parties' intention to convey a security interest. In the present case, the Indenture states "[e]ach Issuer covenants and agrees that *it will use its reasonable best efforts to ob-*

*tain consent* from the Department of Interior—Bureau of Indian Affairs to the imposition of a leasehold mortgage on the leasehold interest...." At most, this is an agreement to *try* to convey a security interest, not an agreement to convey a security interest. The documents acknowledge, in fact, that the approval of the BIA is necessary to convey a valid security interest to BONY. The Indenture Agreement does *not* contain language conveying a lien on the leasehold to the BONY; rather, the Prospectus clearly acknowledges that the bond issue was closed *without* a security interest being conveyed.

BONY argues that USA Capital had actual or inquiry notice of BONY's interest in the lease because it had received and reviewed the Indenture and the Prospectus prior to closing its loan with Epic Palm Springs. *See, e.g., Great American Ins. Co. v. Bailey (In re Cutty's–Gurnee, Inc.)*, 133 B.R. 934 (Bankr.N.D.Ill.1991) (lender who had actual notice that borrower agreed to give first lender a second mortgage upon refinancing was held to have inquiry notice of first lender's equitable mortgage). USA Capital argues that it acted in good faith and in a commercially reasonable manner and should not be penalized for BONY's failure to perfect a security interest in the leasehold.

" 'Inquiry notice' requires only notice of 'facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery.' " *EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 305 (3d Cir. 2002) *citing Becker v. Hamada, Inc.*, 455 A.2d 353, 356 (Del.1982). Although USA Capital had possession of the Indenture Agreement and Prospectus, the documents did not evidence that any liens had been granted to BONY, as noted above. At most, USA Capital was put on notice to inquire whether the lien anticipated by the

Indenture had, in fact, been granted. This USA Capital did. USA Capital performed a diligent inquiry to determine whether any prior liens existed. It ordered an independent third party to perform a title examination of the property. In addition, USA Capital required Epic Palm Springs to represent and warrant that the loan transaction with USA Capital did "not and will not ... result in a breach or constitute a default under, ... or require any consent, under, any indenture...." [5] *See* Loan Agreement at ¶ 5.2(e). As an additional precaution, USA Capital obtained an opinion letter from Epic's counsel, which stated that the lease was not encumbered by any security interest.[6] Thus, we conclude that USA Capital satisfied its duty to inquire whether there were any prior valid liens on the leasehold.

The Court agrees with USA Capital's argument that, even if a valid security interest was created by language of the Indenture, the security interest would be invalid because the BIA's approval is required before a lien interest can be conveyed. *See* 25 C.F.R. § 162.610.

In addition, the equities of the case do not favor BONY. If we were to grant an equitable lien to BONY on the Palm Springs lease, then it would have a lien without the BIA's approval, without recording any interest and without making reasonable efforts (over 2 years) to record its interest. *See, e.g., In re Trim–Lean Meat Products, Inc.* 10 B.R. 333, 335 (D.Del.1981) (court refused to recognize an equitable lien where the claimant has not

"done everything reasonable under the circumstances to perfect its lien"). Under the Indenture, it was contemplated that the BIA's approval would be obtained within 60 days. It was not. Instead, BONY waited almost two years to assert a lien on the lease when it commenced the adversary complaint against USA Capital. We do not believe the circumstances of the case warrant ignoring state and federal requirements for perfection of a security interest. *See, e.g., In re Esta Later Charters, Inc.,* 875 F.2d 234, 239 n. 11 (9th Cir.1989) (*"vigilantibus non dormientibus aequitas subvenit,"* that is "equity aids the vigilant, not those who slumber on their rights").

### 3. *Equitable subordination*

■ BONY also seeks to subordinate the secured claim of USA Capital to its own claim pursuant to section 510(c) of the Bankruptcy Code. 11 U.S.C. § 510(c) states, in pertinent part:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

■ To determine whether a claim of higher priority should be equitably subordinated under section 510(c) three ele-

---

**5.** *Cf. Gertsch v. Johnson & Johnson Fin. Corp. (In re Gertsch),* 237 B.R. 160, 170 (9th Cir. BAP 1999) ("lenders do not have to hire detectives before relying on borrowers' ... statements.... Although a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification.")

**6.** Although USA Capital received the attorney opinion letter *after* the closing of the loan between USA Capital and Epic Palm Springs, in light of its other inquiries, we conclude that it did make reasonable efforts to assure itself there were no other liens on the Property.

ments are required: 1) the claimant has engaged in some type of inequitable conduct, 2) the misconduct has resulted in injury to other creditors and conferred an unfair advantage on the claimant, and 3) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986–987 (3d Cir.1998), *citing United States v. Noland*, 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) and *In Re Mobile Steel Co.*, 563 F.2d 692 (5th Cir.1977).

 The movant's burden depends on whether the respondent, whose claim might be subordinated, is an insider or non-insider. The burden of proof is less demanding when the respondent is an insider. *Ansel Properties v. Nutri/System of Florida Associates (In re Nutri/System of Florida Associates)*, 178 B.R. 645, 657 (E.D.Pa.1995). If the respondent is not an insider or fiduciary, then the movant must prove with particularity "egregious conduct such as fraud, spoilation or overreaching." *Id. See also In re Vietri Homes, Inc.*, 58 B.R. 663, 665 (Bankr.Del. 1986). Courts recognize three general categories of behavior that may constitute inequitable conduct: 1) fraud, illegality, or breach of fiduciary duties; 2) undercapitalization; and 3) claimant's use of the debtors as a mere instrumentality or alter ego. *Nutri/System*, 178 B.R. at 658.

BONY argues that USA Capital satisfies the first prong because it entered into a loan agreement with Epic Palm Springs, despite notice of the restrictive covenants in the Indenture [7] and the alleged equitable lien. BONY asserts that this conduct constituted tortious interference with the Indenture. It argues that USA Capital's failure to investigate the underlying situation and its effort to take priority despite such notice provides sufficient grounds for equitable subordination.[8]

We conclude that BONY failed to satisfy its burden of demonstrating egregious conduct on the part of USA Capital, a non-insider. There is no evidence of fraud, illegality, breach of fiduciary duties, undercapitalization, or use of Epic Palm Springs as a mere instrumentality or alter ego. While USA Capital has admitted that it read the Indenture and the Prospectus prior to approving a loan to Epic Palm Springs, the Court does not find this sufficient to rise to the level of egregious conduct.

 Further, we cannot conclude that USA Capital tortiously interfered with the agreement between BONY and Resorts. The elements of tortious interference of a business relationship are as follows: "(1) the existence of a contractual, or prospective contractual relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relationship, or to prevent the prospective relation from occurring; (3) the absence of a privilege or justification on the defendant; (4) the occasioning of actual legal damage as a re-

---

**7.** The covenants prohibited the Debtors from incurring additional debt or additional security interests on the Epic Palm Springs Collateral.

**8.** *See, e.g., Model Imperial, Inc.*, 250 B.R. 776 (Bankr.S.D.Fla.2000). The Court in *Model Imperial* equitably subordinated the claims of a creditor who gave a revolving credit facility to the debtor despite having knowledge of negative covenants in loan documents with another creditor. *Id. In Model Imperial*, however, the creditor loaned money despite having knowledge that the debtor engaged in numerous fraudulent transactions that were illegal and economically unsound. *Id.* There is no evidence in the present case that USA Capital had any knowledge that Epic Palm Springs engaged in illegal business practices.

sult of the defendants' conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant." *LaBrum & Doak v. Brown (In re LaBrum & Doak, LLP)*, 225 B.R. 93 (Bankr.E.D.Pa.1998).

There is no evidence of purposeful action on the part of USA Capital to harm the relationship between Resorts, Capital and BONY. Epic Palm Springs advised USA Capital that no other creditor held a lien on the lease. Although USA Capital had knowledge of the restrictive covenants, Epic Palm Springs represented and warranted that the entry into the secured loan transaction with USA Capital did "not and will not . . . result in a breach or constitute a default under, . . . or require any consent under, any indenture. . . ." *See* Loan Agreement at ¶ 5.2(e). In addition, USA Capital's report did not reveal any other liens on the lease. Prior to consummating the transaction, USA Capital confirmed with the BIA that no other lien existed on the property. USA Capital's actions were not intended to harm any relationship between BONY and Resorts. Furthermore, the relationship between Resorts, Capital and BONY was not altered: BONY did not have a lien on the leasehold prior to USA Capital's loan to Epic Palm Springs and did not have one after the loan.

BONY argues that inequitable conduct is not required, but rather that "[a]n inquiry must be made on a case-by-case basis, focusing on fairness to the other creditors in light of all the circumstances, to determine whether subordination is appropriate absent creditor misconduct." *Cutty's–Gurnee*, 133 B.R. at 959.

Although some courts recognize "no fault" equitable subordination, even in those cases, "a court must 'explore the particular facts and circumstances presented in each case before determining whether subordination of a claim is warranted'." *Montgomery Ward Holding Corp. v. Robert Schoeberl*, 272 B.R. 836 (Bankr.Del. 2001) *citing In re Burden v. United States*, 917 F.2d 115, 120 (3d Cir.1990).

■■■ "Equitable subordination is an extraordinary measure which is not lightly invoked." *MB Limited Partnership, et al. v. Nutri/System, et al. (In re Nutri/System, Inc.)*, 169 B.R. 854, 865 (Bankr. E.D.Pa.1994). The equities in this case do not warrant penalizing USA Capital by subordinating its claim when it took all the steps necessary to perfect its interest. Moreover, the fact that the BONY did not obtain the necessary BIA approval should not be held against USA Capital. USA Capital entered into the transaction with Epic Palm Springs in good faith and after inquiring into the existence of any prior liens. It relied on Epic Palm Springs' representation that the loan would not create a breach under the Indenture. BONY on the other hand, slept on its rights and is, therefore, not entitled to equitable relief.

As a result, USA Capital's lien remains as a first perfected lien in the Collateral. Since the parties concede that the value of the Collateral is less than the real estate liens and USA Capital's lien, the estate lacks equity in the Collateral.

### C. *Necessity for an Effective Reorganization.*

■■■ USA Capital argues that the property is not necessary for an effective reorganization since Epic Palm Springs' operations are minimal and there is no postpetition financing.[9] The Trustee argues,

---

9. At the time USA Capital filed its Stay Mo- tion this was the case. However, since then

however, that Epic Palm Springs is necessary for an effective reorganization because it is integral to any reorganization of Epic Palm Springs individually, as well as any reorganization of the Epic family as a whole. In fact, Epic Palm Springs contains approximately 44% of the unsold inventory at all Epic properties. Further, Epic Palm Springs adds value to the overall enterprise since it is one of six resorts owned by the Debtors that can be accessed by timeshare owners. In pressing its litigation and seeking approval of the Settlement Agreement,[10] the Trustee emphasized that a successful reorganization or sale of the Debtors was dependent on retaining control of *all* of the resort properties.

USA Capital argues that, even if the property is necessary for an effective reorganization, there is no prospect of reorganization within a reasonable time. The Trustee disagrees. Besides the post-petition financing, the Trustee argues that the Settlement Agreement reached with the various parties ending the pending litigation and management problems allows the Trustee to focus solely on rehabilitating and reorganizing the Debtors, including Epic Palm Springs. We agree with the Trustee that the Settlement Agreement demonstrates that there is now a reasonable prospect that these Debtors can be reorganized or sold as going concerns.

### D. *Cause for Stay Relief*

 USA Capital argues that if the Court finds that relief from the automatic stay is not warranted under section 362(d)(2), it is nonetheless entitled to relief under section 362(d)(1) because adequate protection payments have not been made to USA Capital and the value of the Collateral is deteriorating. Although USA Capital is an undersecured creditor, the Supreme Court has held that an undersecured creditor whose collateral is decreasing in value is entitled to adequate protection payments. *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

 In the present case, however, there is no evidence demonstrating that the value of the Collateral is deteriorating. However, "[i]t is well established that a creditor can meet its initial burden of evidence production on the issue of 'cause' under § 362(d)(1) by introducing evidence of the debtor's failure to make post-petition installment payments on a secured debt." *In re Hinchliffe*, 164 B.R. 45, 48 (Bankr.E.D.Pa.1994).

It is conceded that neither Epic Palm Springs nor the Trustee has made any payments to USA Capital. Nor does the Trustee's budget include any adequate protection payments to USA Capital from the post-petition loan. At the hearings concerning the post-petition financing, none of the parties provided any reason why adequate protection payments could not be made to USA Capital. We conclude that the lack of adequate protection payments may constitute "cause" for relief from the automatic stay. We will conduct a further evidentiary hearing on the amount of such payments.

### IV. *CONCLUSION*

For the foregoing reasons, we deny BONY's cross-motion for Summary Judgment and grant USA Capital's Motion for

---

the Trustee has obtained post-petition financing, although it provides only $500,000 for Epic Palm Springs and no debt service payments are to be made to USA Capital.

**10.** USA Capital participated in the hearing on approval of the Settlement Agreement.

Summary Judgment. A further hearing to consider the amount of adequate protection payments which must be paid to USA Capital will be held on March 17, 2003, at 2:00 p.m.